United States District Court
Western District of New York
Sara ▰▰▰ Kielly [ Plaintiff ]

v.

Dr. David S. Dinello, MD. ,
RN Robert Jansen, Anthony Annucci ,
Dr. Carl Koenigsman, MD. ; [Defendants]
in their official and individual capacities.



COMPLAINT

Jury Trial Demanded

Civil Act. No.: __18 CV 6945__

DIN#: 12B3915

C#: 555798

Plaintiff Sara G. Kielly, pro se, for her complaint against defendants
Dr. David S. Dinello, MD., Dr. Carl Koenigsman, MD., and Commissioner
Anthony Annucci, alleges the following:

## A. Jurisdiction and Venue:

1.) The Court has jurisdiction over this action under 28 USC §§1331
and 1343(3) and (4). The matters in controversy arise under 42 USC
§1983.

2.) Venue properly lies in this district pursuant to 28 USC § 1391 (b)(2),
because the events giving rise to this cause of action occurred at Five
Points Correctional Facility ("Five Points"), in Romulus, NY, which is
located in the Western Division of NY.

## B. Parties:

3.) Plaintiff Sara G. Kielly ("Plaintiff"), is and was at all times relevant
hereto a confined NYS prisoner, ▰ confined in the custody of
the NYS Office of Mental Health ("NYSOMH") under an involuntary

[ Pg. 1 / 15 ]

psychiatric commitment under NYS Corrections Law 3402(9), and the NYS Department of Corrections and Community Supervision ("NYS DOCCS"), respectively. While in the custody of NYSDOCCS Plaintiff was incarcerated at Five Points; while Plaintiff was in the custody of NYSOMH Plaintiff was incarcerated at Central NY Psychiatric Center ("CNYPC"). Plaintiff is currently incarcerated at CNYPC.

4.) Defendant Dr. David S. Dinello, MD. was, at all times relevant hereto, a physician employed or retained by NYS DOCCS, as the Regional Health Director ("RHD"), and Acting Facility Health Services Director ("AFHSD"), to provide medical services at Five Points, and supervise all other medical providers at Five Points.

5.) Defendant Dr. Carl Koenigsmann, MD. was, at all times relevant hereto, a physician and Deputy Commissioner, employed or Retained by NYSDOCCS, as the Chief Medical Officer ("CMO"), to manage, supervise, and operate the NYSDOCCS medical department statewide. Koenigsman is charged with creating, implementing, and enforcing department policy and procedures; supervising and training department medical providers; disciplining department medical providers; and adequately screen department medical providers during the hiring process, and reasonably during their employment, particularly the licensure records for physicians employed by NYSDOCCS. Koenigsman has the duty of ensuring all prisoners in NYSDOCCS recieves adequate, safe, effective, and competent medical treatment that comports with medical standards.

[Pg. 2/15]

6.) Defendant Anthony Annucci, was at all relevant times hereto, the acting Commissioner of NYSDOCCS. As Commissioner defendant is the Chief Executive Officer ("CEO") of NYSDOCCS; defendant operates and manages all of the facilities within the department; impliments and enforces policies and procedures of the department; ensuring constitutional conditions and treatment of the prisoners in his custody in NYSDOCCS; effectively screen the department's hired and retained employees - particularly ensuring that all medical providers are properly licensed, and authorized to practice their respective areas of medicine, and are competent to do so; and overseeing, and administering, the NYSDOCCS' Office of Special Investigations ("OSI") to investigate allegations, incidents of, and act on substantiated complaints of abuse of inmates in his custody.

7.) Defendant Robert Jansen, RN., was at all times relevant times hereto, a registered nurse ("RN") employed or retained by NYSDOCCS, at Five Points, to provide medical services at Five Points.

C. Previous Lawsuits by Plaintiff:

8.) Plaintiff has filed one other action relating to the same facts in this action:

    1.] "Kielly v. State of NY" - NYS Court of Claims,
    Claimant: Sara Kielly;    Claim #: Unknown - Pending;
    District: Utica;    Under: Hon. - unknown/Pending;
    Filed on: December 15, 2018    Type: State Civil action;
    Outcome: Pending    Other: No federal claims raised, only state tort and constitutional claims; Defendant is the State, thus same defendants are not involved.

9.) Plaintiff has filed other actions generally relating to her prison conditions, but do not raise the same facts as this complaint:

    1.] "Kielly v. Lunduski, et al." - USDC: WDNY
    Plaintiff: Sara Kielly;    Defendants: Denise a. Lunduski, Christopher Roberts, Anthony Annucci;

Action #: Unknown    Type: Civil - 42 USC §1983;

Under: Hon. David G. Larimer ; Filed on: Unknown (2018)

Status: Pending - In Discovery with appointed Counsel

Outcome: Pending.


2. J "Kielly v. Jones, et al." - NYS Oneida Cnty. Supreme Court;

Petitioner: Sara Kielly ; Defendants: Laurine Jones,
Deborah McCulloch;

Index #: CA 2018-000 2353; Under: Hon. Justice Erin P. Gall;

Filed on: Approx. August 2018 ; Status: Pending - apptment of
Counsel made;

Outcome: Pending ; Type: NYS CPLR Art. 70 - Habeas Corpus.


3. J "Outman v. Waldron, et al." * USDC - NDNY

Defendants: Victoria Chase, Patrick McCoy, Joann Waldron;

Plaintiff: Alan Outman (now known as: Sara Kielly);

Action #: Unknown ; Type: Civil - 42 USC §1983;

Under: Hon. Mae D. D'Agostino; Filed on: Approx. 2015

Completed on: Approx. Sept. 2016

Outcome: Verdict for defendants by Jury after trial.


# D. Exhaustion of Administrative Remedies:

10.) Plaintiff has exhausted her administrative remedies by:

a. J filing grievances on August 28, 2018;

b. J appealing dismissal of filed grievances;

c. J filing a written complaint with the NYSDOCCS
Office of Special Investigations ("OSI");


[ pg. 4 /15 ]

d. ) filing a written complaint with the Office of the Inspector General for N.Y.S.

e. ) filing written complaint with the: "Justice Center for Individuals with Special Needs".

## E. Facts:

10.) On June 6, 2018, approximately, Plaintiff was housed in cell number 3, of the Five Points infirmary.

11.) Plaintiff, a transgender female suffering severe "gender dysphoria", suffered a psychiatric decompensation, and attempted to castrate herself with only her hands, and finger nails.

12.) Due to Plaintiff's castration attempt she caused her right testicular artery, upon information and belief, to be severed.

13.) Due to Plaintiff being on a therapuetic regimine of blood thinners ("Cumadin"), Plaintiff suffered rapid, gushing, and uncontrollable bleeding from the severed artery.

14.) As Plaintiff was bleeding critically a Corrections Officer ("CO") made a security round, and saw Plaintiff's arterial gushing wound, and blood covering Plaintiff's floor and legs.

15.) The witnessing CO notified the infirmary Sergeant, Sgt. Orlich, and the on-duty infirmary Nurse J. Springer.

16.) Sgt. Orlich had Plaintiff placed on a one-to-one constant suicide observation, conducted by CO J. Mahr.

17.) RN J. Springer came to Plaintiff's cell side, and looked at Plaintiff, whom had a make-shift turnequet on the artery, but that did not stem the flow of arterial blood.

18.) RN J. Springer left the cell side after shrugging, and indicating she was "not concerned".

[Pg. 5 / 15]

19.) After significant time passed, and Sgt. Orlich saw that Plaintiff had lost a dangerous amount of blood, Orlich summoned the Now on-duty infirmary Nurse, Defendant Robert Jansen, to plaintiff's cell.

20.) Defendant Jansen, upon visualizing Plaintiff from the cell door, laughed, and stated the following to Plaintiff: "Well, you fucked up this time, huh? Since you claim to have medical experience, you can fix it, cause I don't give a fuck."

21.) Defendant Jansen then walked away.

22.) Under information and belief, Defendant Jansen failed deliberately, to follow policy, and did Not call the on-call emergency sick-call physician for emergency medical intervention.

23.) Plaintiff was sluggish, pale, laboring to ~~breath~~ breath, and slow to respond to stimuli, with excessive and copious amounts of blood on the floor, door, wall, and plaintiff's hands, and entire body from the ~~waist~~ waist down.

24.) Plaintiff's condition, and obvious bloody appearance, was clearly severe enough to be obvious to even a lay-person to be a critical medical emergency.

25.) Sgt. Orlich then compelled Defendant Jansen to call the on-call emergency medical physician for intervention.

26.) Defendant Jansen told Plaintiff, Co Mahr, and Sgt. Orlich that ~~XXXXXXXXXXX~~ Defendant Dinello, the on-call physician for off-hours medical emergencies, told him to "do nothing", and that Defendant Dinello would "stich" plaintiff up in the morning when he came in to work.

[ Pg. 6 | 15 ]

27.) Upon information and belief, Defendant Dinello was not due to come into the facility until approximately nine (9) am in the morning, hours away.

28.) Defendant knew Plaintiff was on high dose blood thinner therapy, making even a minor bleed potentially life - threatening. [ See: Exhibit A - Certificate of Examining Physician ]

29.) Defendant was left to bleed uncontrollably until she began to grow systemically numb, in severe pain, woozy, confused, and believed she was going to die, as well as lethargic.

30.) Not until plaintiff lost conciousness at the toilet did Defendant Jansen enter Plaintiff's cell to take her vital signs. [ See: Exhibit B - Kielly Affidavit]

31.) Upon reading Plaintiff's vital signs Defendant Jansen reacted with "shock", and told Plaintiff to "do me a favor, or remain lying down."

32.) Defendant Jansen told Sgt. Orlich, in front of Plaintiff, that he could not do anything, and would have to wait for Defendant Dinello to come into work.

33.) Defendant Jansen ignored Plaintiff's critical medical condition, and followed medical orders he, under information and belief, knew were negligent, and would likely lead to Plaintiff's death, deliberately.

34.) Defendant Jansen later led a group of nurses past the Plaintiff's cell for what appeared to be for "shock value", with a smile on his face.

[ pg. 7 |15 ]

35.) Sgt. Orlich, upon information and belief, entered Plaintiff's cell numerous times, due to Plaintiff going in and out of conciousness, attempting to locate a carotid pulse.

36.) Upon information and belief, Sgt. Orlich, due to significant fear for my life, sought two nurses from elsewhere in the facility to assess plaintiff. [ see: Exhibit B: Kielly affidavit]

37.) Carol Gardener, RN, and Ms. Bromwell, RN., upon seeing plaintiff immediately activated emergency protocol, summoning an advanced life support ambulance to transport Plaintiff to Cayuga Medical Center.

38.) Plaintiff was treated for an arterial, pulsatile bleed, and hypovolemic shock (critical blood loss) at Cayuga Medical Center ("CMC") in Ithica, NY, by upon information and belief Dr. Hinkley.

39.) Plaintiff was suffering from:
   a.) severe shivering and shaking,
   b.) uncontrollable arterial bleed,
   c.) severe pain, d.) severe lethargy,
   e.) critical blood loss.

40.) Plaintiff required transfusion of two bags of unmatched O+ packed red-blood cells, and one bag of plasma. [see: Exhibit B - Kielly affidavit ]

41.) Plaintiff lost control of her bodily functions, and then suffered a seizure on the table.

[Pg. 8 | 15]

42.) Plaintiff suffered severe burning pain up her arm, into her chest and stomach, during the blood transfusion.

43.) Plaintiff had to be sedated due to her seizure activity with Ativan by IV.

44.) Dr. Hinkley activated emergency helicopter medivac for ~~xxxx~~ Plaintiff, to a trauma center.

45.) Upon information and belief, plaintiff could not be medivac'd by helicopter due to foggy weather conditions.

46.) Plaintiff lost conciousness at CMC on the table during treatment.

47.) Plaintiff awoke at Upstate University Hospital, in Syracuse, NY after arrival by ground ambulance. [*See: Exhibit B- Kielly affidavit]

48.) Plaintiff was admitted several days, and underwent surgery.

49.) Defendant Dinello, on approximately June 14, 2018, after exposing Plaintiff to unsanitary conditions, removed her scrotal wound drain before instructed to by the urology surgeon.

50.) On June 17, 2018 Plaintiff was admitted to Upstate University Hospital for Sepsis, upon information and belief.

51.) Plaintiff was in a critical condition due to a sepsis infection in her right testicle.

52.) Plaintiff underwent emergency surgery to evacuate, and amputate her right scrotum, and testicle, causing traumatic disfiguration.

53.) Plaintiff suffered aggregious pain, and humiliation, due to extended post-operative amputation care; that included "wet-to-dry" packing, and wound debriedment. [See: Exhibit B - Kielly affidavit]

54.) Plaintiff suffered the following physical injuries due to the deliberate actions, and inactions, of Defendants Dinello, Jansen, Annucci, and Koenigsmann, these include, but are not limited to:

a.] Hypovolemic shock;  b.] seizures;

c.] Loss of conscienceness for extended periods;

d.] severe reoccuring abdominal and genital pain since amputation of testicle;

e.] Permanent disfiguring amputation of right scrotal tissue and right testicle;

f.] Systemic "numbness";

g.] aggregiously painful warm unmatched blood and plasma transfusion;

h.] aggregious scrotal, testicular, and abdominal pain due to systemic sepsis infection;

i.] Extended hospitalization with placement of invasive intravenous lines;

j.] Significant and invasive surgery on two occassions within approximately two weeks, requiring general anastesia and intubation;

k.] Critical loss of blood;

L.] Painful fast heart rate,  M.] Nausua;

N.] Extended, aggregiously painful post-operative amputation wound care;

O.] Loss of weight.

[Pg. 10 (15]

55.) Plaintiff suffered the following mental, and psychological, anguish and trauma, that includes but is not limited to:

a.] loss of apetite,  b.] uncontrollable crying fits;

c.] increased anxiety;  d.] increased depression;

e.] aggregious fear of death;

f.] increased inability to trust;

g.] increased inability to build therapuetic rapports;

h.] aggregious humiliation;  i.] increased apathy;

j.] increased dispair;

k.] increased nightmares and night terrors;

l.] reoccuring increased panic attacks.

56.) Defendant Dinello pled guilty to one count of "professional misconduct" under N.Y. Education Law §6530 (3), by reason of his practicing medicine on more than one occassion, on October 18th, 2010.
[see: Exhibit C: NYS Board of Professional Medical Conduct #10-229 Packet]

57.) Defendant Dinello was officially sanctioned due to "BPMC" #10-229, and his guilty plea, with a permanent ban on practicing emergency medicine, on November 22, 2010.
[see: Exhibit C: BPMC #10-229;
Exhibit D: NYS-DOH Misconduct/Disciplinary Registry;
Exhibit E: NYS-DOH Discipline-Physician Info-Dinello]

58.) Prior to, and on June 6, 2018, particularly in acting as the only on-call physician for medical emergencies when

plaintiff was critically bleeding from her severed artery, Defendant Dinello deliberately, knowingly, and maliciously violated his lawful sanctions banning him from practicing emergency medicine, in violation of his 2010 "consent ~~license~~ agreement and order", NY Educ. Law §6530(29), and plaintiff's constitutional rights.
[see: Exhibits C - E]

59.) Plaintiff suffered the aggregious injuries and anguish in points #'s 54 and 55, due to Defendant Dinello's illegal unauthorized practice of emergency medicine.

60.) Defendants Koenigsman, and Annucci, knew or reasonably should have known Defendant Dinello, was a disgraced and ~~sanctioned~~ sanctioned medical physician, with a permanent ban from practicing emergency medicine.

61.) Defendants Koenigsman and Annucci had a compulsory duty to vet, review, and investigate the licenses and backgrounds of the medical professionals they hire and employ.

62.) Defendant Dinello's record, and professional sanctions, are a matter of public record, and easily found through the NYS Department of Health website registry.
[see: Exhibit E]

63.) Defendant Dinello's negligent medical practice, and sanctions, can be easily found by searching "David S. Dinello, MO" on the Google search engine.
[see: Exhibit F: Central NY News - Nov. 23, 2010;
Exhibit G: auburnpub.com - Nov. 24, 2010.]

[Pg. 12/15]

64.) Defendants ~~sir~~ Koenigsman, and Annucci, can not claim ignorance since Defendant Dinello's record, negligent medical practice pattern, and sanctions are so public as to be readily accessable even to a layman.

65.) Defendants Koenigsman, and Annucci, deliberately failed to protect plaintiff from unauthorized, and negligent medical providers and treatment.

66.) Defendants Koenigsman, and Annucci, deliberately failed to adequately screen their medical physicians, and prevent negligent and unauthorized treatment by it's own employee Defendant Dinello.

67.) Upon information and belief, Defendants Koenigsman, and Annucci, knowingly, deliberately, and maliciously allowed Defendant Annucci to violate his state license sanctions, and commit unauthorized practice of emergency medicine.

68.) Defendants Koenigsman, and ~~Dinello~~ Annucci, allowed Defendant Dinello to supervise every medical provider in Dinello's prison region ~~sir~~ in emergency medicine, as the "Regional Health Director", when law does not allow a physician to supervise an area of medicine he is sanctioned from practicing.

[Pg. 13|15]

69.) Plaintiff would not have suffered such aggregious injury, and near death critical state, nor permanent amputation of her right scrotum and testicle, but for Defendants' Koenigsman and Annucci's deliberate failure to protect Plaintiff from such aggregiously negligent medical malpractice, and unauthorized practice of emergency medicine by their own Regional Health Director - Defendant Dinello, by way of such deliberate, concerted, and blatant conspiracy.

## F. Statement of Claim:

70.) At all times herein, defendants were "persons" for the purposes of 42 USC §1983, and acted under color of law to deprive plaintiff of her constitutional rights, as set forth more fully above.

## G. Claim Counts:

71.) COUNT ONE (1): Breach of Duty to Protect:
US Const. Ammend. 8th - All Defendants; ⑳

72.) COUNT TWO (2): Conspiracy to commit a Breach of Duty to Protect:
US Const. Ammend. 8th - All Defendants except Defendant Jansen; ⑳

73.) COUNT THREE (3): Unconstitutional Prison Conditions:
US CONST. Ammend. 8th - Defendants Annucci, Koenigsman, Dinello. ⑳

74.) COUNT FOUR (4): Conspiracy to Commit Unconstitutional Prison Conditions:
US Const. Ammend. 8th - Defendants Annucci, Koenigsman, Dinello; ⑳

75.) COUNT FIVE (5): EXCESSIVE FORCE:
US Const. Ammend. 8th - Defendant Dinello; ⑳

76.) COUNT SIX (6): Deliberate Indifference to a Serious Medical Need:
US CONST. Ammend. 8th - All Defendants; ⑳

[ Pg. 14 / 15 ]

77.) COUNT SEVEN (7): Conspiracy to commit Deliberate Indifference to a Serious Medical Need;

US CONST. AMMEND. 8th – Defendants Annucci, Koenigsman, Dinello.

H.) Prayer for Relief:

78.) Plaintiff requests an order declaring defendants have acted in violation of the US Constitution.

79.) Plaintiff requests an injunction compelling defendants to remove Defendant Dinello, and all other unauthorized and/or insufficiently licensed medical providers, from their positions within NYSDOCCS.

80.) Plaintiff requests an order directing the NYS Attorney, and appropriate US Attorney's Office, to open an investigation of defendants', and NYSDOCCS', deliberate use of unauthorized medical providers to treat inmates, and the involved conspiracy to commit.

81.) Plaintiff requests an order permanently removing and releasing her from the defendants', and NYSDOCCS' custody by a convening of a Prisoner Release Panel, directing Plaintiff serve her remaining lawful sentence in a forensics facility of the NYS Office of Mental Health.

82.) Plaintiff seeks compensatory, and punitive, damages in an amount no less than $500,000.00 (Five Hundred Thousand Dollars and 00/100), for her pain, suffering, and aggregiously violated constitutional rights in a manner shocking to the conscience of society, as determined by a just and duly impaneled jury.

Dated: December 15, 2018

[Pg. 15/15]

Dana Kielty   C#: 555 798
(Pro Se - Plaintiff)   DIN: 12B3715

# EXHIBIT A

Certificate of Examining Physician

[pgs. 2]

FORM OMH 471A-CNY(11-15)

State of New York
Office of Mental Health

| **CERTIFICATE OF EXAMINING PHYSICIAN**<br><br>To Support an Emergency Admission Under Correction Law § 402 (9) | **Name:**  Kielly, Sara    **C#: 555798**<br><br>**Sex:**  Male (Transgender)    **Year of Birth:** 1989<br><br>**Central New York Psychiatric Center**<br><br>**Unit: Five Points CF** |

[Redacted]
(case header)
(unrelated)

## *CERTIFICATION*

I, _____ David Dinello, M.D. _____ , hereby certify that:

           (Name of Examining Physician)

1.    I am a physician licensed to practice medicine in the State of New York.

2.    On the __16th__ day of __January__, __2018__, I personally examined

    __Kielly, Sara – 12B3915_____    who was located at

    Five Points Correctional Facility Correctional Facility , and in my opinion this person has a mental illness for which immediate inpatient care and treatment in a hospital is appropriate.

3.    I certify that this person's hospital admission is medically necessary.

4.    It is my opinion that this person's mental illness is likely to result in serious harm to himself or herself or others. By "likely to result in serious harm," I mean:

(Check appropriate statements)

__X__  a substantial risk of physical harm to the person as manifested by threats of or attempts at suicide or serious bodily harm or other conduct demonstrating that the person is dangerous to himself or herself (*"other conduct" shall include the person's refusal or inability to meet his or her essential need for food, shelter, clothing, or health care, provided that such refusal or inability is likely to result in serious harm if there is not immediate hospitalization):*

and/or

_____  a substantial risk of physical harm to other persons, as manifested by homicidal or other violent behavior by which others are placed in reasonable fear of serious physical harm.

FORM OMH 471A-CNY (11-15)

| CERTIFICATE OF EXAMINING PHYSICIAN (CONTINUED) | Name: Kielly, Sara | C#: 555798 |
|---|---|---|

5. **The specific behavior(s) or specific act(s) of this person, or any additional clinical information deemed necessary, on which I base my opinion as follows:**

I/P Sara Kielly, formerly Alan Outman, DIN 12B3915, is presently serving a 25 year to Life sentence for Murder 1st. Per records, I/P Kielly caused the death of a 23-year-old victim, after sexually engaging with him. I/P Kielly identifies as a transgender (male to female) and legally changed her name from Alan Outman to Sara Kielly in 2016.

**Psychiatric History:**
There is no known psychiatric care or hospitalization prior to her incarceration.

Per CNYPC mental health records, she is presently diagnosed with Borderline Personality Disorder and Gender Dysphoria Disorder (by history). Since the beginning of this incarceration, there have been many verbal and physical threats from I/P Kielly and acts of self-harm, as well as attempts at self-mutilation. She was admitted to mental health services in 2012 and has consistently received mental health services since that time.

She has previously been admitted to special programming on an ICP and has also had two previous CNYPC Inpatient Hospitalizations; the most recent lasting less than a month. Prior to the last inpatient admission, she attempted self-castration and successfully removed one testis from the scrotal sac. While at CNYPC she again was found to have a testis protruding from the scrotal sac and was sent to Upstate Medical Center. She was returned to DOCCS directly from the hospital. I/P Kielly was placed into protective custody due to being transgender, where she was residing comfortably and meeting with mental health staff regularly since her return to Corrections on 8/31/17. During time in PC, she has remained focused on Gender Reassignment procedures and medical appointments. Hormone therapy was later discontinued due to the formation of a blood clot and the necessity of medical intervention in the form of blood thinning medication. Recently (December 2017), determination was made that ongoing behavioral and emotional instability were significant contributing factors against recommendation to pursue gender reassignment until she could display both emotional and behavioral stability.

In the last six months, she has been admitted to RCTP six times for acts of or threats of self-harm. The most recent admission began on 12/26/17 and has including the following self-injurious events; Cutting testes, inserting foreign objects into urethra and scrotal sac, swallowing a razor, hoarding coumadin and then inserting them into an open wound, running head into a wall and requiring outside hospital intervention to remove foil from inside penis. I/P Kielly has continued to engage in acts of self-harm, increasing in self-violence and necessitating a higher level of medical care. At present, she is considered medically stable, on an antibiotic and remains optimistic, yet unrealistic, regarding gender reassignment surgery. The determination for this surgery has been reviewed with her, and the specialist has made the decision not to recommend reassignment as a direct result of Ms. Kielly's apparent inability to maintain at a correctional facility without engaging in acts of self-mutilation. I/P Kielly presents as minimally engaged in therapeutic sessions, presenting as flattering and superficial with most mental health and medical staff.

Due to patient's severe gender dysphoria, and her continuing escalation of self-harming behaviors, it is my opinion that Ms. Kielly needs the care and treatment only available in an inpatient psychiatric hospital.

| Signature *David Dinello MD* | Print Name Signed David Dinello, MD | Title Regional Heath Director | | |
|---|---|---|---|---|
| Address Five Points Correctional Facility | Phone Number 607-869-5111 x6526 | Date | Time | |
| | | 1  16  18 | 09  30  am | |

EXHIBIT

B

Affidavit of Kielly

[pgs. 14]

State of New York.
Board of Professional Medical Conduct

Sara G. Kielly - c#: 555798

　　　　DIN#: 12B3515 (Complainant)

V.

David S. Dinello, MD., (Accused Professional)

State of New York )
　　　　　　　　　　) SS.:
County of Oneida )

Medical Conduct
Complaint Affidavit

## Affidavit of Sara G. Kielly　　(Pg. 1 of 14)

I, Sara G. Kielly, being duly sworn according to law deposes and says: that I am the complainant in the above titled complaint, and was a patient under the care and treatment of David S. Dinello, M.D. from 2017 to approximately June 15, 2018.

1.) As an inmate incarcerated at Five Points Correctional, I was often under the direct medical treatment, and care, of David S. Dinello M.D. from at least November 2017 to June 15, 2018, approximately.

2.) David S. Dinello, the Regional Health Director, in charge of Five Points CF, was the acting facility health services director and was often tasked with rendering emergency medical care to inmates coming into the facility clinic on emergency sick call after hours, including myself.

3.) After hours, when the only medical staff in the facility was nurses, David Dinello, was the only on-call medical provider, available for medical staff to call for emergency medical treatment decisions, to include medication orders, and authorization to transfer to an outside hospital for treatment at an outside emergency room.

5.) On June 6, 2018, I attempted to castenate in my Five Points Correctional Facility infirmary cell, by shredding my scrotal sack over an extended period of time with my hands, and fingernails.

6.) In the process of ripping the scrotal tissue, and exposing the right testicle, I severed the testicular artery leading to the right testicle.

7.) Due to being on therapeutic blood thinners (ie: Cumadin), I began bleeding uncontrollably from the severed artery, in gushing spurts and arterial pulsatile spray.

8.) David Dinello, the Five Points C.F. acting Facility Health Services Director ("AFHSD"), and "Regional Health Director", was the only on-call medical provider for after hours medical emergencies.

9.) RN J. Springer upon visualizing my wound walked away, and did not return, presumably she had phoned Dinello for a emergency sick-call determination and triage.

10.) After a significant time passed, and Infirmary Sergeant Orlich saw I was losing a critical amount of blood, he compelled RN Robert Jansen to assess me.

11.) Upon his, Jansen's, arrival at my door he laughed, and said "well, you fucked up this time, huh? Since you claim to have medical experience, you can fix it cause I don't give a fuck", and walked away.

(Pg. 2/14)

12.) As I continued to bleed uncontrollably from my severed artery Correc. Officer Mahr continued to update Sgt. Orlich of my condition.

13.) After more time past Sgt. Orlich, seeing I was sluggish, pale, laboring to breath, and slow to Respond to stimuli, compelled RN Jansen to call David Dinello, the on-call emergency "sick-call" provider on duty.

14.) After calling Dinello, RN Jansen came to my cell side, and told me in front of Sgt. Orlich, and C.O. Mahr, that Dinello had instructed him to "do nothing", and that Dinello said he'd "stitch it up in the morning when he came in".

15.) At that point, I was in severe pain, beginning to grow systemically numb, woozy, confused, and believed I was going to die.

16.) When I stood up to attempt to go to the bathroom (ie: pee) I lost conciousness at the toilet, and came to with Sgt. Orlich, C.O. Mahr, and RN Jansen staring at me from my cell door.

17.) RN Jansen entered my cell, and took my blood pressure, and pulse, after I made it to a sitting position on my bed.

18.) RN Jansen reacted with "surprise" at my vitals, and told me to do him "a favor", and stay laying down.

19.) RN Jansen told Sgt. Orlich that all he "could do" was wait for

( Pg. 3 /14 )

David Dinello to come in later that morning, as Dinello had already denied transport to woutside hospital.

20.) As time continued to pass, and my cell floor was nearly completely covered in my blood, I continued to grow weaker, more tired, and my vision began to blur.

21.) At one point, RN Jensen led a line of nurses past my cell for what appeared to be "shock and entertainment" value.

22.) At that point, I was going in and out of conciousness on my bed, and was "awoken" by Sgt. Orlich numerous times checking for signs of life, and a carotid pulse.

23.) Sgt. Orlich, to my knowledge, in fear for my life, sought out two nurses from else where in the facility to intervene on my medical emergency.

24.) When RN's Bromwell, and Carol Gardener, arrived at my cell they reacted with shock, and immediately began placing me on full flow non-rebreather oxygen, and a sixteen gauge IV was placed by RN Bromwell in my right A.C., with IV fluids running at fully open.

25.) Bromwell, and Gardener, to my knowledge, due to the imminent threat to my life, overrode Dinello's instructions to leave me until he "came in", and activated emergency ALS ambulance transport for me by South Seneca Ambulance to Cayuga Medical Center ("CMC").

(Pg. 4 / 14)

26.) Several days later, RN Bromwell told me that she had not expected me to survive the ambulance trip to the <u>CMC</u> ER.

27.) Upon the arrival of the ambulance at Five Points C.F., it took nearly twenty minutes for the ambulance to be allowed through the clearance gate, because it had arrived while "count procedures" were occuring, due to the delay in activating transport by Dinello.

28.) When this delay was occuring, RN Gardener was literally begging RN Jansen to do something to clear the ambulance into the facility, due to my critical condition.

29.) When the ambulance finally was allowed into the facility I was semi-concious, lethargic, and continuing to bleed.

30.) The ambulance crew immediately transferred me to the ambulance stretcher, and loaded me into the ambulance.

31.) The paramedic immediately began searching for a second IV sight for a trauma gauge, but due to my hypovolemic state and critical loss of blood, she struggled to find a viable vein.

32.) The paramedic even resorted to attempting to find a viable vein in my feet, but was still unsuccessful.

33.) At some point, during the transport she was able to place a trauma gauge IV in my left A.C., but only after she pressurized the IV fluid bag running into my right A.C. with a blood

(Pg. 5/14)

pressure cuff to cause rapid infusion, and make my veins more viable.

34.) When I would attempt to speak to the paramedic she would often have to ask me to repeat myself, with her ear near my mouth to be able to hear me, as my voice was weak.

35.) Upon arrival at <u>CMC</u> the ambulance crew was directed to take me, to my knowledge, to room #14, the trauma bay.

36.) Once in the room I was immediately transferred to the treatment table, placed in trendelinburg position, and immediately evaluated by, to my knowledge, Dr. Hinkley, the ER trauma doctor.

37.) Dr. Hinkley reacted with visceral shock when he assessed the scrotal wound, and bleed, stating out loud that I had an arterial, pulsatile bleed.

38.) I was uncontrollably shaking, and shivering, and attempting to verbally respond to Dr. Hinkley's questions, which I believe was his attempt to keep me "awake".

39.) I, at some point, was able to tell Dr. Hinkley that I was on a high dose of "Cumadin" (approx. 10mg.), to which Dr. Hinkley reacted with immediate, visceral concern.

40.) Dr. Hinkley, due to my critical imment condition, ordered two bags of unmatched red blood cells, and to my knowledge one bag of plasma, be emergently and rapidly transfused into me.

(Pg. 6/14)

41.) Dr. Hinkley called for emergent paging of general surgery, urology, and other hospital specialists.

42.) During the transfusion, I experienced <u>extreme</u>, burning pain and heaviness, in my arm, chest, and stomach, as the warm blood was rapidly forced into my body.

43.) Dr. Hinkley placed multiple "figure-eight" sutures into the bleeding artery, which he verbally articulated for his scribe, along with a metal hemostat placed on the other end of the artery.

44.) Dr. Hinkley yelled for nursing staff to activate "Life-Net" medivac procedures for emergency trauma flight to Upstate University Hospital - Level One Trauma Center, in Syracuse, N.Y.

45.) Having lost conciousness and being soaked in sweat, I came to again with Dr. Hinkley yelling, and a nurse pushing medication into my I.V. When I asked weakly what was happening, I was told by Dr. Hinkley that I'd suffered a seizure episode due to hypovolemic shock, and critical blood loss, and I was being given "Ativan" to control the seizure activity with sedation. ⊗

46.) Before losing conciousness for an extended period, the last thing I remember in the <u>CMC</u> ER was a nurse telling Dr. Hinkley that "Life-Net" medivac was unavailable due to the foggy weather, and Dr. Hinkley telling the nurse that he didn't think I'd survive a "ground transport".

47.) I have absolutely no memory of my emergency ground ambulance

(Pg. 7 / 14)

transport from CMC to Upstate University Hospital, as I was either unconscious, or not consciously aware and alert.

48.) My next memory, and coming out of the unconsciousness, was when I was already at Upstate University Hospital ("U.U.H."), in the E.R. being treated and prepared to be moved out of the E.R.

49.) When I became partially conscious, again later, I was being evaluated by the U.U.H. urology surgery attending, with a chaplain present, per my living-wills directive for when I'm in such a critical condition cessation of life is considered immenantly possible.

50.) Due to the severity of the injury, and my critical state I had to undergo urological surgery to "repair" the blood vessels, and testicular / scrotal tissue.

51.) To my knowledge, I received another bag of transfused blood upon arrival at U.U.H.

52.) I was admitted for inpatient care for approximately four days, and discharged with stitches, and a "pen-Rose" drain in my right scrotum on June 9, 2018, approximately.

53.) Upon return to Five Points C.F., with the drain still in my scrotum, David Dinello directed Kristen Salotti, N.P. to not admit me to the infirmary suicide cell for medical observation, but to instead have me placed in the unsanitary, fecal and body fluid covered, mental health observation cells in the mental health unit, because I "didn't need to be in the infirmary".

(Pg. 8 / 14)

54.) On approximately June 11, 2018 when Dr. Irene Dadson, M.D, and Ms. Janice Evans, LMSW II, met with me for a observation interview, I explained that I still had a drain in my scrotum, and with the unsanitary nature of the observation cell, and the fact I was naked but for a "suicide smock", and thus unable to keep the drain clean, and off of unsanitary surfaces, I was at significant risk for a life-threatening infection.

55.) Dr. Dadson agreed with me on the need for me to be in the infirmary due to infection risk, and simply for medical observation due to the gravity of the surgery just days before.

56.) Dr. Dadson spoke with Ms. Jennifer Domagalski, LMSW II, the Unit Chief for the Five Points C.F. Mental Health Unit, and expressed the need for me to be immediately admitted to the infirmary.

57.) David Dinello did not admit me to the infirmary for joint medical observation, and "suicide watch", until Ms. Domagalski spoke to him, stating I needed to be in the infirmary as she was concerned for my health while in an observation cell.

58.) On June 14, 2018, approximately, David Dinello entered my infirmary cell, and told me that he was going to remove my drain earlier than directed by the U.U.H. urology surgeon specialist.

59.) When I expressed concern about him removing the drain due to it still discharging copious amounts of bloody, mucousy fluid, let alone remove it earlier than directed by the specialist, David Dinello laughed,

(pg. 9/14)

and told me he didn't care what the specialist directed, because I was in prison, and as the "Regional Health Director" he had the "final say"; that he was <u>not</u> required to accept the direction of the outside ~~~~ specialist, and his decision was "final".

60.) He, David Dinello, also laughed as he told me that I was lucky I'd gotten over on him by getting Ms. Domagalski to tell him to admit me because he saw no reason why I needed to be in the infirmary, and if I had caught an infection it would have only been "minor".

61.) Not given an option for the removal of the drain, as Dinello told me that if I refused he'd have the CO's <u>hold me down</u>, as he pulled it out, as he wanted me out of his infirmary as soon as possible, I allowed Dinello told remove the drain earlier than he was supposed to, as I had no other choice.

62.) Dinello removed the drain without <u>any</u> form of aseptic technique, to include <u>not</u> using medical gloves.

63.) On June 15, 2018 the wound had closed upon itself, and was highly painful, sensitive, and swollen.

64.) On June 15, 2018 I was transferred upon ~~~~ Dinello's, and Dr. Dodson's, two physician certification commitment, to Central NY Psychiatric Center ("<u>CNYPC</u>").

65.) On June 17, 2018, only three days after Dinello inappropriately removed the drain, and stitches, I was suffering severe abdominal pain, and chills, and was emergency transported, by Dr. McClain's

(Pg. 18/14)

order, to Faxton - St. Luke's ER in Utica. NY.

66.) While under treatment at St. Luke's ER I was significantly hypotensive, and diagnosed by CT scan with enteritis. Due to the diagnostic results, Dr. Browne determined I needed to be admitted, but felt it was prudent to transfer me to U.U.H. since that was where I'd underwent surgery.

67) During ALS inter-hospital transport by Kunkel Ambulance, I went unconcious twice, and my blood pressure drop as low as 82/56 for extended periods. causing the ambulance to upgrade to an emergency transport.

68) Once at U.U.H. ER, I was immediately assessed, evaluated, and admitted for inpatient treatment of a significant infection that was quickly approaching sepsis.

69.) I was treated with three high-powered IV antibiotics, including "Vancomycin", in an attempt to control the infection.

70.) One morning, my medical team doctor, Dr. Kadopi, came rushing into my hospital room, and told me that if she did not get me into emergency surgery with a urology surgeon, immediately, my body would likely begin shutting down in a matter of hours due to my new systemic sepsis infection in my right scrotum, and testicle.

71.) When I woke up from surgery the recovery room nurse, and the doctor, told me they were unable to save the testicle, and the

(Pg. 11 (14)

entire right side scrotal tissue, as they'd found a "softball" size wauth of puss, and nacrotic tissue, when they open up my right scrotum again.

72.) I was admitted for a total of eight days for this infection, and surgery, to include post-operative wound vaccuum treatment.

73.) I underwent several months of extremely painful, and humiliating wound treatment, with wet-to-dry packing, and wound cleaning at CNYPC, due to the post-operative treatment.

74.) Dinello's conduct nearly took my life on two occasions, once due to bleeding out, and once due to sepsis, and he committed his actions with no regard for my life, safety, or health.

75.) Dinello had complete knowledge of my blood-thinner therapy at the time, and before, he was called for emergency medical treatment decisions, as he was the one who'd prescribed it; but he deliberately failed to provide emergency treatment when he knew I was suffering a life-threatening bleed, even though he knew he was the only medical provider available to authorize treatment.

76.) Dinello has not only been allowed to practice medicine on a high-risk, and vulnerable patient class (ie: prisoners), but he is being allowed to, and is, practice emergency medicine against the permanent ban against him by the ethics board in 2010, on patients that are largely unable to make complaints to the ethics board, or seek treatment elsewhere.

(Pg. 12/14)

77.) To my knowledge Dinello has never shown Remorse, or true guilt, for his deliberate refusal to provide adequate medical care that comports with acceptable medical standards.

78.) Dinello has continually failed to practice medicine ethically, or acceptably, and due to such he has permanently disfigured me, and potentially caused me to be ineligible for gender reassignment surgery, due to the lose of scrotal tissue unnecessarily.

79.) My pain, and severe suffering, was directly caused by Dinello's deliberate refusal to provide necessary medical treatment and his unauthorized practice of emergency medicine against his state sanctions.

80.) Dinello's conduct, and illegal practice of emergency medicine, that nearly killed me twice, and permanently disfigured me by amputation of an intimate body part, is borderline criminal and could be deemed to be "attempted murder", and "assault".

90.) I implore the State of New York, and the Ethics Board, to fully investigate this matter, and David Dinello's continued medical misconduct, and practicing emergency medicine against the Ethics Board's permanent ban from him practicing emergency medicine.

91.) Dinello may not have directly injured the three patients in 2007, and 2008, that led to his 2010 sanctions, but he nearly killed me, permanently disfigured me, and there is no knowing what

(Pg. 13/14)

he has done to other highrisk, vulnerable patients under his care in the NYS Department of Corrections and Community Supervision.

92.) I implore NYS to revoke Dinello's medical license completely, and permanently, and to sanction him in any other manner available including criminally if possible.

Dated: _____ October 25th _____, 2018

---

Signed and sworn to before me this the 25th day of October _____, 2018.

_Lauren Curtacci_
(NOTARY PUBLIC)

S
T
H
N
P

LAUREN A CURTACCI
Notary Public, State of New York
Registration #01CU6270566
Qualified in Oneida County
Commission Expires Oct. 22, 2020

_Sara G. Kielly_

C#: 555798

DIN: 12B3915

Cent. NY Psych. Center
9005 Old River Rd.
PO Box 300
Marcy, NY 13403

(Pg. 14 of 14)

# ExHIBIT

# C

NYS Board of Professional Medical
Conduct #10-229 Packet

[pgs. 11] ~~xxxxxx~~ ⑳



**New York State Board for Professional Medical Conduct**
433 River Street, Suite 303 • Troy, New York 12180-2299 • (518) 402-0863

*Richard F. Daines, M.D.*
*Commissioner*
*NYS Department of Health*
*James W. Clyne, Jr.*
*Executive Deputy Commissioner*
*Keith W. Servis, Director*
*Office of Professional Medical Conduct*

*Kendrick A. Sears, M.D.*
*Chair*
*Carmela Torrelli*
*Vice Chair*
*Katherine A. Hawkins, M.D., J.D.*
*Executive Secretary*

Public

November 15, 2010    [Redacted] (in (case header) (unredacted))

### CERTIFIED MAIL-RETURN RECEIPT REQUESTED

David S. Dinello, M.D.
119 North Street
Auburn, NY 13021

Re:   License No. 210557

Dear Dr. Dinello:

    Enclosed is a copy of BPMC #10-229 of the New York State Board for Professional Medical Conduct. This order and any penalty provided therein goes into effect November 22, 2010.

                             Sincerely,

                             REDACTED

                             Katherine A. Hawkins, M.D., J.D.
                             Executive Secretary
                             Board for Professional Medical Conduct

Enclosure

cc:   Catherine A. Gale, Esq.
     Gale & Dancks
     P.O. Box 6527
     Syracuse, NY  13217-6527

NEW YORK STATE          DEPARTMENT OF HEALTH
STATE BOARD FOR PROFESSIONAL MEDICAL CONDUCT

| | |
|---|---|
| IN THE MATTER<br><br>OF<br><br>**DAVID DINELLO, M.D.** | CONSENT<br><br>ORDER<br><br>BPMC No. #10-229 |

Upon the application of DAVID DINELLO, M.D. (Respondent), in the attached Consent Agreement and Order, which is made a part of this Consent Order, it is

ORDERED, that the Consent Agreement, and its terms, are adopted and it is further

ORDERED, that this Consent Order shall be effective upon issuance by the Board, either

• by mailing of a copy of this Consent Order, either by first class mail to Respondent at the address in the attached Consent Agreement or by certified mail to Respondent's attorney, OR

• upon facsimile transmission to Respondent or Respondent's attorney, whichever is first.

SO ORDERED.

DATE: _11-13-2010_

REDACTED

KENDRICK A. SEARS, M.D.
Chair
State Board for Professional Medical Conduct

NEW YORK STATE            DEPARTMENT OF HEALTH
STATE BOARD FOR PROFESSIONAL MEDICAL CONDUCT

| | |
|---|---|
| IN THE MATTER<br><br>OF<br><br>DAVID DINELLO, M.D. | CONSENT<br><br>AGREEMENT<br><br>AND<br><br>ORDER |

David Dinello, M.D., representing that all of the following statements are true, says:

That on or about June 9, 1998, I was licensed to practice as a physician in the State of New York and issued License No. 210557 by the New York State Education Department.

My current address is 119 North Street, Auburn, NY 13021. I will advise the Director of the Office of Professional Medical Conduct of any change of address.

I understand that the New York State Board for Professional Medical Conduct (Board) has charged me with one specification of professional misconduct.

A copy of the Statement of Charges, marked as Exhibit A, is attached to and part of this Consent Agreement.

I plead guilty to the First Specification in full satisfaction of the charges against me and agree to the following penalty:

1.     My license to practice medicine shall by restricted to prohibit the practice of emergency medicine; and

2.     Three year period of probation on the terms and conditions set forth in Exhibit B, attached hereto and made part hereof.

1

I further agree that the Consent Order shall impose the following conditions:

That Respondent shall remain in continuous compliance with all requirements of N.Y. Educ Law § 6502 including but not limited to the requirements that a licensee shall register and continue to be registered with the New York State Education Department (except during periods of actual suspension) and that a licensee shall pay all registration fees. Respondent shall not exercise the option provided in N.Y. Educ. Law § 6502(4) to avoid registration and payment of fees. This condition shall take effect 30 days after the Consent Order's effective date and will continue so long as Respondent remains a licensee in New York State; and

That Respondent shall cooperate fully with the Office of Professional Medical Conduct (OPMC) in its administration and enforcement of this Consent Order and in its investigations of matters concerning Respondent. Respondent shall respond in a timely manner to all OPMC requests for written periodic verification of Respondent's compliance with this Consent Order. Respondent shall meet with a person designated by the Director of OPMC, as directed. Respondent shall respond promptly and provide all documents and information within Respondent's control, as directed. This condition shall take effect upon the Board's issuance of the Consent Order and will continue so long as Respondent remains licensed in New York State.

I stipulate that my failure to comply with any conditions of this Consent Order shall constitute misconduct as defined by N.Y. Educ. Law § 6530(29).

2

I agree that, if I am charged with professional misconduct in future, this Consent Agreement and Order **shall** be admitted into evidence in that proceeding.

I ask the Board to adopt this Consent Agreement.

I understand that if the Board does not adopt this Consent Agreement, none of its terms shall bind me or constitute an admission of any of the acts of alleged misconduct; this Consent Agreement shall not be used against me in any way and shall be kept in strict confidence; and the Board's denial shall be without prejudice to the pending disciplinary proceeding and the Board's final determination pursuant to N.Y. Pub. Health Law.

I agree that, if the Board adopts this Consent Agreement, the Chair of the Board shall issue a Consent Order in accordance with its terms. I agree that this Consent Order shall take effect upon its issuance by the Board, either by mailing of a copy of the Consent Order by first class mail to me at the address in this Consent Agreement, or to my attorney by certified mail, OR upon facsimile transmission to me or my attorney, whichever is first. The Consent Order, this agreement, and all attached Exhibits shall be public documents, with only patient identities, if any, redacted. As public documents, they may be posted on the Department's website.

I stipulate that the proposed sanction and Consent Order are authorized by N.Y. Pub. Health Law §§ 230 and 230-a, and that the Board and OPMC have the requisite powers to carry out all included terms. I ask the Board to adopt this Consent Agreement of my own free will and not under duress, compulsion or restraint. In consideration of the value to me of the Board's adoption of this

3

Consent Agreement, allowing me to resolve this matter without the various risks and burdens of a hearing on the merits, I knowingly waive my right to contest the Consent Order for which I apply, whether administratively or judicially, I agree to be bound by the Consent Order, and I ask that the Board adopt this Consent Agreement.

I understand and agree that the attorney for the Department, the Director of OPMC and the Chair of the Board each retain complete discretion either to enter into the proposed agreement and Consent Order, based upon my application, or to decline to do so.  I further understand and agree that no prior or separate written or oral communication can limit that discretion.

DATE _10/ 18/10_

REDACTED

DAVID DINELLO, M.D.
RESPONDENT

4

The undersigned agree to Respondent's attached Consent Agreement and to its proposed penalty, terms and conditions.

DATE: _10/20/2010_

REDACTED

CATHERINE A. GALE, ESQ.
Attorney for Respondent

DATE: _10/26/10_

REDACTED

KEVIN C. ROE   Timothy J. Mahar
Associate Counsel
Bureau of Professional Medical Conduct

DATE: _11/12/10_

REDACTED

KEITH W. SERVIS
Director
Office of Professional Medical Conduct

5

EXHIBIT A

NEW YORK STATE                DEPARTMENT OF HEALTH
STATE BOARD FOR PROFESSIONAL MEDICAL CONDUCT

| | |
|---|---|
| IN THE MATTER<br>OF<br>DAVID DINELLO, M.D. | STATEMENT<br>OF<br>CHARGES |

DAVID DINELLO, M.D., Respondent, was authorized to practice medicine in New York State on or about June 9, 1998, by the issuance of license number 210557 by the New York State Education Department.

## FACTUAL ALLEGATIONS

A.    Respondent provided medical care and treatment to Patient A at the Emergency Department of Auburn Memorial Hospital on June 15, 2008. Respondent's care and treatment of Patient A failed to meet accepted standards of care, in that:  Respondent failed to adequately evaluate Patient A prior to discharge.

B.    Respondent provided medical care and treatment to Patient B at the Emergency Department of Auburn Memorial Hospital on June 7, 2008. Respondent's care and treatment of Patient B failed to meet accepted standards of care, in that:  Respondent failed to adequately evaluate Patient B prior to discharge.

C.    Respondent provided medical care and treatment to Patient C at the Emergency Department of Auburn Memorial Hospital on April 25, 2007. Respondent's care and treatment of Patient C failed to meet accepted

standards of care, in that:  Respondent failed to adequately evaluate Patient C prior to discharge.

## SPECIFICATION OF CHARGES

## NEGLIGENCE ON MORE THAN ONE OCCASION

Respondent is charged with professional misconduct under N.Y. Educ. Law § 6530(3) by reason of his having practiced medicine with negligence on more than one occasion, in that Petitioner charges:

1.    The facts set forth in two or more of the following paragraphs: A, B and/or C.

DATE:  *October 26* 2010
        Albany, New York

REDACTED

Peter D. Van Buren

Deputy Counsel

Bureau of Professional Medical Conduct

## EXHIBIT B

### Terms of Probation

1. Respondent's conduct shall conform to moral and professional standards of conduct and governing law. Any act of professional misconduct by Respondent as defined by N.Y. Educ. Law §§ 6530 or 6531 shall constitute a violation of probation and may subject Respondent to an action pursuant to N.Y. Pub. Health Law § 230(19).

2. Respondent shall maintain active registration of his license (except during periods of actual suspension) with the New York State Education Department Division of Professional Licensing Services, and shall pay all registration fees.

3. Respondent shall provide the Director, Office of Professional Medical Conduct (OPMC), Hedley Park Place, 433 River Street Suite 303, Troy, New York 12180-2299 with the following information, in writing, and ensure that this information is kept current: a full description of Respondent's employment and practice; all professional and residential addresses and telephone numbers within and outside New York State; and all investigations, arrests, charges, convictions or disciplinary actions by any local, state or federal agency, institution or facility. Respondent shall notify OPMC, in writing, within 30 days of any additions to or changes in the required information.

4. Respondent shall cooperate fully with, and respond in a timely manner to, OPMC requests to provide written periodic verification of Respondent's compliance with the terms of this Consent Order. Upon the Director of OPMC's request, Respondent shall meet in person with the Director's designee.

5. Respondent's failure to pay any monetary penalty by the prescribed date shall subject Respondent to all provisions of law relating to debt collection by New York State, including but not limited to: the imposition of interest, late payment charges and collection fees; referral to the New York State Department of Taxation and Finance for collection; and non-renewal of permits or licenses [Tax Law § 171(27); State Finance Law § 18; CPLR § 5001; Executive Law § 32].

6. The probation period shall toll when Respondent is not engaged in active medical practice in New York State for a period of 30 consecutive days or more. Respondent shall notify the Director of OPMC, in writing, if Respondent is not currently engaged in, or intends to leave, active medical practice in New York State for a consecutive 30 day period. Respondent shall then notify the Director again at least 14 days before returning to active practice. Upon Respondent's return to active practice in New York State, the probation period shall resume and Respondent shall fulfill any unfulfilled probation terms and such additional requirements as the Director may impose as reasonably relate to the matters set forth in Exhibit "A" or as are necessary to protect the public health.

7. The Director of OPMC may review Respondent's professional performance. This review may include but shall not be limited to: a review of office records, patient records, hospital charts, and/or electronic records; and interviews with or periodic visits with Respondent and staff at practice

locations or OPMC offices.

8.   Respondent shall adhere to federal and state guidelines and professional standards of care with respect to infection control practices. Respondent shall ensure education, training and oversight of all office personnel involved in medical care, with respect to these practices.

9.   Respondent shall maintain complete and legible medical records that accurately reflect the evaluation and treatment of patients and contain all information required by State rules and regulations concerning controlled substances.

10.  Within thirty days of the Consent Order's effective date, Respondent shall practice medicine only when monitored by a licensed physician, board certified in an appropriate specialty, ("practice monitor") proposed by Respondent and subject to the written approval of the Director of OPMC. Any medical practice in violation of this term shall constitute the unauthorized practice of medicine.

   a.   Respondent shall make available to the monitor any and all records or access to the practice requested by the monitor, including on-site observation. The practice monitor shall visit Respondent's medical practice at each and every location, on a random unannounced basis at least monthly and shall examine a selection (no fewer than 20) of records maintained by Respondent, including patient records, prescribing information and office records.   The review will determine whether the Respondent's medical practice is conducted in accordance with the generally accepted standards of professional medical care. Any perceived deviation of accepted standards of medical care or refusal to cooperate with the monitor shall be reported within 24 hours to OPMC.

   b.   Respondent shall be solely responsible for all expenses associated with monitoring, including fees, if any, to the monitoring physician.

   c.   Respondent shall cause the practice monitor to report quarterly, in writing, to the Director of OPMC.

   d.   Respondent shall maintain medical malpractice insurance coverage with limits no less than $2 million per occurrence and $6 million per policy year, in accordance with Section 230(18)(b) of the Public Health Law. Proof of coverage shall be submitted to the Director of OPMC prior to Respondent's practice after the effective date of this Order.

11.  Respondent shall enroll in and complete a course continuing medical education in the area of initial evaluation of patients. This continuing medical education program shall be subject to the Director of OPMC's prior written approval .

12.  Respondent shall comply with this Consent Order and all its terms, and shall bear all associated compliance costs. Upon receiving evidence of noncompliance with, or a violation of, these terms; the Director of OPMC and/or the Board may initiate a violation of probation proceeding and/or any other such proceeding authorized by law against Respondent.

EXHIBIT

D

NYS - DOH Misconduct /Disciplinary

Registry

[ pgs. 2 ]



## Department of Health

Individuals/Families          Providers/Professionals          Health Facilities          Search

New Physician Search          **Search**          **1 documents found**

Physician Records          **Results -**

On: 10/20/2018 8:31 PM

**You searched for:**          Last Name: dinello   First Name: david   Middle Name: s

License: 210557   Type: --------------

Effective Date From: -------------   Effective Date To: ---------------

Update Date From:   -------------:   Update Date To:   --------------

| Physician Last Name | Physician First Name | Physician Middle Name | License Number | License Type | Effective Date | Date Updated | Year of Birth |
|---|---|---|---|---|---|---|---|
| Dinello | David | S | 210557 | MD | 11/22/2010 | 11/15/2010 | 1967 |

**\* If there is a list of name(s) above, click on each name to see the disciplinary information.**
**If there is no list of names, there is no public disciplinary action that matches what you entered for the search.**

**Reminder: This database contains public disciplinary actions for 1990 and later.**

---

Return to Professional Misconduct and Professional Discipline
Return to Welcome Page

Send questions or comments to:
opmc@health.ny.gov

Home Page / From the Commissioner / Directory Services / Vital Records /
Info for Consumers / Info for Providers / Info for Researchers /
Public Health Forum / What's New / HELP! / Search our Web Site

---

Questions or comments: nhinfo@health.ny.gov          Revised: March 2017

## Department of Health

**About**          **Events**                              **Help**

Howard Zucker, Commissioner

Contact

Employment Opportunities

Grants & Funding Opportunities

Laws & Regulations

Press Releases

Publications and Educational Material

Freedom of Information Law (FOIL)

Forms

Related Sites

Health Topics A to Z

A to Z en Español

Meetings, Hearings and Special Events

Webcasts

Other Events

Help Increasing the Text Size in Your Web Browser

File Formats Used on this Web Site

Disclaimer

Privacy Policy

Accessibility

Language Assistance

Español (Spanish)

中文 (Chinese)

Русский (Russian)

Italiano (Italian)

Kreyòl Ayisyen (Haitian-Creole)

한국어 (Korean)

## CONNECT WITH US

FACEBOOK          TWITTER          YOUTUBE          PINTEREST

# EXHIBIT

# E.

NYS - DOH Discipline - Physician
Information for Dinello

[ pgs. 3 ]

Department of Health

Individuals/Families        Providers/Professionals        Health Facilities        Search

# Physician Information

Physician
Search

Physician
Records

| | |
|---|---|
| **Physician Last Name:** | Dinello |
| **Physician First Name:** | David |
| **Physician Middle Name:** | S |
| **Address:** | 119 North Street Auburn, NY 13021 |
| **License Number:** | 210557 |
| **License Type:** | MD |
| **Year of Birth:** | 1967 |
| **Effective Date:** | 11/22/2010 |
| **Action Description for DOH Webpage:** | Probation for three years and the physician is permanently prohibited from the practice of emergency medicine. The physician completed the terms of probation effective November 21, 2013. |
| **Misconduct Description for DOH Webpage:** | The physician admitted guilt to the charge of negligence on more than one occasion |
| **License Restrictions for DOH Webpage:** | The physician is permanently prohibited from the practice of emergency medicine. |
| **Board Order:** | |

BRD 210557.pdf

Return to Professional Misconduct and Professional Discipline
Return to Welcome Page

Send questions or comments to:

opmc@health.ny.gov

Home Page / From the Commissioner / Directory Services / Vital Records /
Info for Consumers / Info for Providers / Info for Researchers /
Public Health Forum / What's New / HELP! / Search our Web Site

---

Questions or comments: nhinfo@health.ny.gov        Revised: March 2017

# Department of Health

**About**

Howard
Zucker,
Commissioner

Contact

Employment
Opportunities

Grants &
Funding
Opportunities

Laws &
Regulations

Press
Releases

Publications
and
Educational
Material

Freedom of
Information
Law (FOIL)

Forms

Related Sites

Health Topics

**Events**

Meetings,
Hearings and
Special
Events

Webcasts

Other Events

**Help**

Help
Increasing
the Text Size
in Your Web
Browser

File Formats
Used on this
Web Site

Disclaimer

Privacy
Policy

Accessibility

**Language
Assistance**

Español
(Spanish)

中文
(Chinese)

Русский
(Russian)

Italiano
(Italian)

Kreyòl
Ayisyen
(Haitian-
Creole)

한국어
(Korean)

**A to Z**

**A to Z en
Español**

## CONNECT WITH US

**FACEBOOK**          **TWITTER**          **YOUTUBE**          **PINTEREST**

# EXHIBIT

# F

Central NY News   - November 23, 2010

[pgs. 2]

[Redacted]
(case header)
(unrelated)



CENTRAL NY NEWS

# Former Auburn Memorial Hospital ER doc disciplined for practicing ne

Updated Nov 23, 2010;
Posted Nov 23, 2010

0

**46**
shares

By **James T. Mulder**, jmulder@syracuse.com,
syracuse.com

Syracuse, N.Y. -- A former Auburn Memorial Hospital emergency room doctor has been disciplined by the s

Dr. David S. Dinello pleaded guilty to the charge in a signed consent agreement with the state Board for Pro
state Health Department's underline{website}.

The agreement prohibits Dinello from practicing emergency medicine and puts him on probation for three y

Dinello failed to adequately evaluate three patients in the hospital's emergency department in 2007 and 20

Under the terms of the agreement, Dinello can only practice medicine when monitored by another doctor a

Roz McCormick, an Auburn Memorial vice president, said Dinello no longer works at the hospital.

Catherine A. Gale, Dinello's attorney, declined to comment on the case.



Former Auburn Memorial Hospital ER doc disciplined for practicing negligently | syracuse.com                    10/20/18, 9:16 PM

Use of and/or registration on any portion of this site constitutes acceptance of our **User Agreement** (updated 5/25/18) and **Privacy Policy and Cookie Statement** (updated 5/25/18).

© 2018 Advance Local Media LLC. All rights reserved (**About Us**).

The material on this site may not be reproduced, distributed, transmitted, cached or otherwise used, except with the prior written permission of Advance Local.

**Community Rules** apply to all content you upload or otherwise submit to this site.

**Your California Privacy Rights**

▷ **Ad Choices**

1

# EXHIBIT

# G

auburnpub.com - November 24, 2010

[pgs. 2]


[Redacted]
(case header)
(unrelated)

BREAKING    Backup QB leads Syracuse to double-overtime win at the Dome

https://auburnpub.com/news/local/update-former-auburn-doctor-pleads-guilty-to-professional-misconduct/article_dab01424-f7f4-11df-872d-001cc4c03286.html

# UPDATE: Former Auburn doctor pleads guilty to professional misconduct

The Citizen staff report   Nov 24, 2010

TRY 1 MONTH FOR 99¢



Dinello professional
misconduct
proceedings
Nov 24, 2010

A former Auburn Memorial Hospital emergency
room doctor has been sanctioned by the state for
unprofessional conduct and negligence that
involved three patients.

David S. Dinello pleaded guilty on Oct. 18 to one
count of professional misconduct for failing to
evaluate three patients before discharging them
from the emergency room between 2007 and
2008.

According to paperwork filed by the state Board
for Professional Medical Conduct, Dinello's
actions constituted negligence.

In exchange for pleading guilty, the state placed
Dinello on three years of probation and
prohibited Dinello from practicing emergency
medicine and required that he be supervised
while working.

Dinello's punishment went into effect Monday.

On Wednesday, Dinello said the hospital is the
one that brought the charges to the state's
attention after he resigned, and that he was
accused of not ordering additional testing or
prescribing additional medications for patients.

Dinello said he did not believe the patients
needed the additional services and that no one
died, was injured or suffered any adverse affects
as a result of his decision.

"Hospitals have a fear of litigation so they overprescribe everything -- drugs, x-rays, CAT scans," Dinello said. "Part of it is our fear and part of it is the hospital makes more money that way."

Dinello said he did not want to spend money fighting the charges since he no longer wants to practice ER medicine. Dinello now works in the drug addiction treatment and occupational medicine fields.

Rozz McCormick, vice president of communications and marketing at AMH, confirmed Dinello resigned two years ago but could not discuss the circumstances of his resignation or of the misconduct charges.

McCormick said the hospital could not comment on Dinello's statements.

According to state documents, Dinello been authorized to practice medicine since 1998.

# VERIFICATION

## [ Kielly v. Dinello, et al. ]

State of New York )
County of Oneida ) ss.:

Sara Kielly, DIN: 12B3915/C#: 555798, being duly sworn deposes and says:

I am the Plaintiff in the above named Action, in the US District Court - Western District of NY. I have read the foregoing complaint duly signed by me on December 15, 2018, and know it's contents; the same is true to my own knowledge, except as to the matters therein stated to be alleged on "information and belief" or "to my knowledge", and to those matters I honestly believe them to be true.

I have reviewed each exhibit in detail that is annexed to the complaint, and they are, to my most honest knowledge, true and correct versions, and have not been altered by me or anyone else, to my knowledge, that would change the original context, force, or meaning of the matters they depict and detail.

Signed and sworn to before me
this the 19th day of December,
2018.

_Lauren Curtacci_
(NOTARY PUBLIC)

_Sara Kielly_ C#: 555798
(Pro Se - Plaintiff) DIN: 12B3915
( Dated: December 19, 2018 )

Lauren Curtacci Stamp
Notary Public - State of New York
Registration # 01CU6270566
Qualified in Oneida County
Commission Expires Oct. 22, 2020

Hon. District Court Clerk

US District Court

Western District of NY

111 Kenneth B. Keating Federal Bldg.

100 State Street

Rochester, NY 14614

Sara Kielly

C#555798/DIN: 12B3915

Cent. NY Psych Center

9005 Old River Rd

P.O. Box 300

Marcy, NY 13403

Re: "Kielly v. Dinello, et al."

Emergency Prelim. Injunc. & Temp. Restraining Order.

Hon. Court Clerk,                                    December 21, 2018

        Enclosed, please find the due paperwork to commence a federal action under 42 USC §1983, for my civil rights.

        Please duly notice my motion for an emergency preliminary injunction, and temporary restraining order, with memorandum of law, and supporting affidavit. This matter involves immenant threat to my life, safety, and health; requiring an immenant PI/TRO motion, and a judge's urgent intervention. Delay in action could allow irreprable bodily harm, or even loss of my life, should I be transferred back to NYSDOCCS custody.

        Please process these papers as rapidly as possible, and forward the Injunction/Restraining Order motion papers to a District Judge with clear notice of their immenant emergent nature. Your time and assistance is grately apprecicated. Thank you.

                                    Very Respectfully Yours:

xc: File - SGK

                                    Sara Kielly (Pro Se - Plaintiff)